IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELINA JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 CV 6162 |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff Angelina Jimenez ("Jimenez" or "claimant") filed this action seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied her claim for Supplemental Security Income benefits. The Commissioner argues this Court should affirm its decision. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Jimenez's motion for summary judgment [15] is granted.

I.    BACKGROUND

     A.    Procedural History

Jimenez began receiving Supplemental Security Income ("SSI") disability benefits as a minor in 1998. (*See* R. 37, 186-88.) Claimant reached age 18 on August 13, 2005, at which point her eligibility for benefits was subject to reevaluation. (R. 110, 113-22.) The Bureau of Disability Determination Services determined the claimant to no longer be disabled as of January 1, 2006. (Mem. at 1 [16]; R. at 24; *see also* R. 128.) Claimant appealed that decision. (R. 129-43.) Following a disability hearing, Disability

Hearing Officer Mike Finley upheld that determination upon reconsideration.  (R. 82-90.)  Thereafter, Jimenez requested a hearing, which was held on June 23, 2008, before Administrative Law Judge Michael G. Logan ("ALJ Logan" or the "ALJ").  On February 4, 2009, ALJ Logan issued a written decision denying Jimenez's request for benefits.  (R. 22-32.)  Claimant appealed the ALJ's denial to the Appeals Council, which denied her request for review and adopted the ALJ's decision as the final decision of the Commissioner.  (R. 7-10.)  Jimenez subsequently filed this action.

## B.    Medical History

As a minor, claimant previously received disability benefits.  Claimant's medical records reflect that claimant has been diagnosed with attention deficit hyperactivity disorder ("ADHD") and behavior disorder, learning disability, and depressive disorder.  For example, Walter Pedemonte, a psychiatrist at Saint Mary of Nazareth Hospital Center ("St. Mary's") in Chicago, Illinois, treated claimant with individual outpatient psychotherapy sessions and managed her medications for ADHD and conduct disorder from January 12, 1998 until November 2, 2000.  (*See* R. 189-219.)  In April 1998, Carl Hermsmeyer, Ph.D., reviewed Jimenez's records on behalf of the Social Security Administration ("SSA"), and determined she was eligible for disability benefits for ADHD, "predominantly Hyperactive-Impulsive Type; [and a] Learning Disability."  (R. 186-88.)

The SSA periodically reviews all SSI disability cases to determine if an individual receiving benefits remains disabled.  *See* 42 U.S.C. § 1383 (a)(2)(G)(i).  Here, that reevaluation process began in April 2001.  On April 13, 2001, Jorge Fernald, M.D., a consultative examiner, examined claimant and prepared a "Psychiatric Evaluation" report for the Bureau of Disability Determination Services (the "Bureau").  (R. 292-97.)

He found that Jimenez had signs and symptoms of inattention, hyperactivity, and impulsivity.  (R. 296.)  Additionally, Dr. Fernald's report states "There is no history of auditory, visual, or tactile hallucinations.  She admits though she may have some tactile hallucinations ....  She admits to, in the past, hearing voices but no longer."  (R. 293.) Dr. Fernald found Jimenez did not have psychotic or mood symptoms during the interview, but had "significant depressive symptoms including suicidal ideation and sadness most days"  (R. 296.)  Dr. Fernald diagnosed claimant with ADHD, "Combined Depressive Disorder," and "Learning Disability."  (R. 297.)  In May 2001, Jerrold Heinrich, Ph.D., used Dr. Fernald's report, along with claimant's medical records from St. Mary's, in reevaluating claimant on behalf of the Bureau.  (R. 298-303.)  He concluded claimant remained disabled and had impairments of ADHD, "Depressive Disorder, Learning Disability [and a] history of conduct disorder."  (R. 298.)

As noted above, claimant reached age 18 on August 12, 2005.  In advance of that birthday, on August 2, 2005, claimant participated in a "Continuing Disability Interview" with a representative of the SSA whose name is illegible in the record. (R. 113-122.)  According to that representative's report, claimant stated she was receiving disability benefits for ADHD, there was no change in her condition, and she did not have any new injuries or illnesses.  (R. 113.)  Claimant also reported that she is "going to start seeing" a "Dr. Chain/St. Elizabeth."  (R. 114.)  Given the subsequent history, we assume claimant was referring to Dr. Chung K. Chen, and mentioned St. Elizabeth due to its affiliation with St. Mary's as part of Resurrection Health Care.  (*See* R. 437.)  The record does not indicate how claimant was originally put in contact with Dr. Chen.

On September 2, 2005, claimant had her first meeting with Dr. Chung K. Chen, a

psychiatrist at St. Mary's.[1]  (R. 384.)  Dr. Chen's notes on this date are largely illegible.

Claimant had her second meeting with Dr. Chen on December 21, 2005.  (R. 383.)  Dr.

Chen's notes from this meeting are also largely illegible.  (*Id*.)

On December 13, 2005, claimant completed an "Activities of Daily Living

Questionnaire" for the Bureau.  (R. 123-27.)  Among other things, she reported that she

watches her children and plays with them, but that her mother-in-law does all the

chores, cooking, and cleaning.  (R. 123, 126.)  Claimant reported that she "wash[es] up

and dr[ies] off" but that her mother-in-law does her hair and chooses the claimant's

clothing.  (R. 124.)  She also reported she heard voices of people who were not around,

but that they did not interfere with her activities.  (R. 124.)  Those voices told her not to

go outside, and when she went outside, she reported being afraid that people were

looking at her, talking about her, or would call her names.  (R. 124-125.)  She wrote she

does not like to be around people she does not know because she thinks they are trying

to hurt her.  (R. 125.)  She also reported leaving her home "when necessary [sic]" to

visit family and keep appointments, and that her condition had not changed this.  (*Id*.)

On January 5, 2006, Richard S. Abrams, M.D., performed a psychiatric

examination of claimant on behalf of the Illinois Bureau.  (R. 304-05.)  According to Dr.

Abrams' report, claimant told him, among other things, that her hobbies are "watching

---

[1]  The record does not contain any evidence that claimant sought or received any medical
treatment, or was in any way evaluated by a doctor, for a period of over four years, between
April 13, 2001, when Dr. Fernald, a state consultative physician, examined her, and September
2, 2005, when she first met with Dr. Chen.  Further, claimant's last medical treatment not
required by the Bureau occurred in November 2000, when she met with Dr. Pedemonte of St.
Mary's.  (R. 189.)  Thus, the record reflects that claimant did not herself seek any medical
treatment for nearly five years.

cartoons" and "playing with her children." (R. 304.) She stated that she cooks, cleans, and goes to church every two weeks. (*Id.*) She also reported that she has no female friends, lives with her boyfriend, and talks to her sister once a week. (*Id.*) Claimant said that she was afraid of going out alone and so she does not take public transportation. (*Id.*) Dr. Abrams wrote that claimant has had three psychiatric hospitalizations and sees a psychiatrist monthly for medication. (*Id.*) Claimant evidently reported that she used to have "talking sessions years ago, but not now," and that "she takes no medications currently" and "has not used street drugs or alcohol." (*Id.*) Dr. Abrams also wrote that claimant reported "[s]he hears voices to kill herself since age 11 [sic]," and that she "has not made suicidal attempts, but has had the thoughts." (*Id.*) She also told him that three years earlier, she had worked in a fast food restaurant for one week. (*Id.*)

Dr. Abrams also wrote that, during his examination, claimant's voice was soft and depressed, she did not slur her speech, and she was rational and coherent but superficial. (R. 304.) He found "no gross sign of thought disorder or psychosis." (*Id.*) He also found "no insights into the nature of her problems and little motivation for such." (*Id.*) Dr. Abrams found her memory and attention span "were only fair," and her IQ was "at best borderline" from the clinical exam. (*Id.*) He opined that claimant "appeared very anxious," related with shyness and insecurity, her memory and attention span were "only fair," and she "showed clearly a very low IQ." (R. 304, 305.) He wrote "I did not think she was malingering." (R. 305.) Dr. Abrams concluded by diagnosing claimant with "schizoaffective disorder, 295.70 with depressive features, in partial remission." (R. 305.) He also wrote that claimant had a "[history] of ADHD, but not evident now," found "Borderline intellectual functioning," and noted that if declared disabled, "she would not

be able to handle her own funds due to her poor ability to calculate."  (*Id.*)

On January 17, 2006, Kirk Boyenga, Ph.D., a non-examining medical consultant for the Bureau, completed a mental residual functional capacity ("RFC") assessment of claimant.  (R. 34, 323-26.)  He concluded, among other things, that claimant was moderately limited in her abilities to:  carry out detailed instructions, maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 323-24.)  He found that claimant "experiences an affective disorder, a history of learning problems, and a history of substance addiction."  (R. 325.)  He noted that there was no documentation to corroborate Jimenez's statement that she has received mental health care.  (*Id.*)  He also wrote that "[s]he denies the current use of psychotropic medication, which raises a question about treatment and severity."  (*Id.*)  He noted that her "[c]redibility is also suspect, in light of some inconsistent reports in the record."  (*Id.*)  Dr. Boyenga also found Jimenez was "acceptably oriented and free of thought disorder." (*Id.*)  He noted that although her "sustained concentration is impaired," claimant is "able to care for three children, prepare meals, do cleaning and play games."  (*Id.*)  He also wrote that she was able to retain family relationships but her social skills were impaired, and that she was able to perform simple tasks in settings with reduced interpersonal contact.  (*Id.*)  Finally, he noted that "Reports of travel are inconsistent" and "[f]ield office information and SSA form 454 indicates the capacity for independent travel."  (*Id.*)

Dr. Boyenga separately completed a "Psychiatric Review Technique" report regarding claimant.  (R. 327-340.)  He noted a history of learning problems and possible

schizoaffective disorder. (R. 328, 330.) He also found moderate restrictions in Jimenez's activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 337.)

Phyllis Coon, a representative of the Bureau, met with the claimant on January 18, 2006 and filled out a "Report of Contact" that day. (R. 128.) Ms. Coon reviewed the results of Dr. Boyenga's mental RFC assessment. (*Id.*) On behalf of the Bureau, Ms. Coon determined that claimant was not disabled and that she could work in an occupation not requiring close supervision or close cooperation with coworkers. (*Id.*)

On February 6, 2006, claimant saw Dr. Chen for the third time. (R. 383.) Although Dr. Chen's notes from this meeting are illegible to this Court, the ALJ stated in his opinion that Dr. Chen noted the claimant complained of depression. (R. 28.)

On February 12, 2006, claimant completed a form entitled "Disability Report - Appeal." (R. 129-36.) On that form, she wrote, among other things, that since she last completed a disability report, there had been a change in her condition, specifically, "Since she's been talking diphentycramine, Zoloft, Geodon the Anxiety worsen and her Behavior change. She's angry a lot, has a hard time sleeping, has angry feelings, she's very hyper talking, she's anxiety throught social activitys and doesn't want to eat [sic]." (R. 129.) She also wrote she had experienced new limitations in "mental health, antidepression, paranoid, nervous behavior and unstable [sic]." (*Id.*)

The next day, February 13, 2006, claimant admitted herself to St. Mary's at approximately 4:30 pm, where she stayed until February 15, 2006. (R. 341-71.) During her stay, claimant complained of depression and auditory hallucinations, and indicated

she had been non-compliant with her medication.  (R. 350-52, 422.)  Her drug screen tested positive for cannabinoids.  (R. 349.)  While admitted, claimant attended group, occupational, activity, and one-on-one therapy.  (R. 351.)  Hisham S. Sadek, M.D., was the claimant's attending physician, and he conducted a mental status examination.  (R. 354-55.)  In a report entitled "Psychiatric Evaluation," Dr. Sadek stated that claimant was "alert and oriented times three and appears to be of an average intelligence."  (R. 355.)  She reported "commanding hallucinatory experiences telling her that life is not worth living," but "denied any visual hallucination" or "delusional thoughts of any nature." (*Id.*)  She also reported using marijuana prior to admission.  (R. 354.)  Dr. Sadek gave her a Global Assessment of Functioning ("GAF") score of 30.  (R. 355.)  His discharge report indicated that claimant had a good attention span with no impairment for recent, remote, or immediate recall.  (R. 350-352.)  He diagnosed claimant with "Major depression recurrent with psychotic features" and a history of cannabis abuse.  (R. 350, 355.)  Dr. Sadek noted claimant's "disposition" on discharge to be "fully stabilized," and that she was "discharged with prescriptions for Zoloft, trazodone and Risperdal [sic]." (R. 351.)  He also advised claimant "to see Dr. Chen for follow-up care on 2-20-06," and referred claimant to Dr. Chen's office "at St. Elizabeth Hospital."  (*Id.*)

While being discharged from St. Mary's, claimant also met with Sheila Soto, a social worker.  (R. 413-14.)  According to Ms. Soto's discharge notes, claimant told Ms. Soto that she came to the hospital for depression and hearing voices, "male, female voice telling me that my kids do not love me and nobody love me and to leave.  I try to fight them back."  (R. 413.)  Ms. Soto wrote that claimant "said that now that she is taking medication she is not depressed any more and is not hearing voices."  (*Id.*)  Ms.

Soto also wrote that claimant "is preoccupied with discharge." (*Id.*) Claimant evidently also told Ms. Soto that she does not smoke marijuana but "she has been around people who use; her girlfriend gave her a roll-up but she was not aware it had marihuana." (*Id.*) With respect to claimant's mother, claimant reported to Ms. Soto: "I used to have a good relationship with her but not anymore, I just say Hi and bye to her." (R. 414.) Ms. Soto recommended "activity therapy, occupational therapy, 1:1, educational groups, and medication management under the care of Hisham Sadek, MD." (*Id.*)

At this same time in February 2006, claimant completed a second form entitled "Disability Report - Appeal." (R. 137-43.) Beneath the question asking whether there has been any change in illnesses, injuries, or conditions, claimant checked the box for "yes" and the word "depression" is typed as her description of that change. (R. 137.) Claimant stated that change occurred on February 13, 2006. (*Id.*) Claimant listed Dr. Chen of "St. Elizabeth" as a doctor she visited for "depression." (R. 138.) Where the form asked "How do your illnesses, injuries or conditions affect your ability to care for your personal needs," the word "NONE" is typed. (R. 141.) Where asked "[w]hat changes have occurred in your daily activities since you last completed a disability report?", "I SOMETIME HEAR VOICES [sic]" is written. (*Id.*)

On September 19, 2006, L.M. Hudspeth, Psy.D., completed a "Psychiatric Review Technique" form regarding claimant for the Bureau. (R. 310-22.)[2] Dr. Hudspeth did not examine claimant, but relied on her "updated medical records," specifically listing Dr. Abrams' report from January 2006 and claimant's February 2006 hospitalization at

---

[2] The word "Advisory" is handwritten above the title of this document. (R. 310.) The significance of that word, if any, is not evident on the record before us.

St. Mary's. (R. 322.) He indicated that the categories on which his medical disposition was based were 12.04, Affective Disorders, and 12.09, Substance Addiction Disorders. (R. 310.) Dr. Hudspeth noted claimant's complaints of auditory hallucinations and some suicidal ideation, as well as her reports that she was afraid of being around people and needed to be instructed to care for her children. (R. 322.) Following that description, Dr. Hudspeth wrote: "This is not supported by the medical evidence in the file." (*Id.*) He also wrote: "It is established that the client would be capable of performing a wide range of unskilled tasks." (*Id.*) Finally, he concluded the evidence did not establish the presence of required criterion for the Affective Disorder listing.[3] (R. 321.)

That same day, September 19, 2006, Dr. Hudspeth also completed a mental RFC assessment of claimant. (R. 306-09.)[4] Based on unspecified "enclosed medical information," he found that claimant had a moderate limitation in her ability to understand, remember and carry out detailed instructions. (R. 308; *see also* R. 322.) He also concluded claimant had moderate limitations in her ability to maintain concentration, persistence and pace for an extended period of time. (*Id.*) Dr. Hudspeth found claimant had no limitations in her ability to understand, remember and carry out very short and simple instructions. (*Id.*) He determined she was capable of performing a wide range of unskilled tasks and substantial gainful work activity. (*Id.*)

---

[3] Although Dr. Hudspeth indicated that the evidence did not establish the presence of the "C Criteria" under a portion of the form applying to Anxiety-Related Disorders, it appears, and the parties do not dispute, that indication was inadvertent. Because he completed the corresponding section for Affective Disorders rather than the section for Anxiety-Related Disorders, we assume his responses for the "C Criteria" in fact refer to the Affective Disorders listing. Throughout every other portion of the form, he completed those sections referring to Affective Disorders not Anxiety-Related Disorder category. (R. 310-22.)

[4] The word "Advisory" is also handwritten above the title of this document. (R. 306.) Again, the significance of that word, if any, is not evident on the record before us.

Despite having been advised during her February 15 discharge from St. Mary's to follow up with Dr. Chen on February 20, the record indicates that claimant did not see Dr. Chen for over eight months following her discharge. (R. 351, 383.) On November 1, November 29, 2006, and December 20, 2006, claimant saw Dr. Chen for the fourth, fifth, and sixth times. (R. 383.) Although the notes from those meetings are largely illegible to this Court, the ALJ stated in his opinion that claimant complained of hallucinations during her November 1st meeting with Dr. Chen. (R. 30.)

On January 3, 2007, claimant had a hearing with Disability Hearing Officer ("DHO") Mike Finley, to determine whether claimant remained disabled under the Social Security Act. (R. 144-55, 82-90.) Among other things, claimant told the DHO she spent her days playing with dolls and her children, and that her mother provided childcare (R. 82, 148.) She also told the DHO that she is afraid of people but that her medications help because they calm her. (R. 82-83.) Claimant also indicated that she left her home when she has had her medication, and her mother would make sure she returned before her medications wore off. (*Id.*) The DHO observed claimant to be "very child-like," reported that she "frequently asked if candy would be made available to her" and if there was a television in the hearing office, and that "she stated over and over that she really liked cartoons." (R. 83.)

On May 1, 2007, DHO Finley rendered a decision based on claimant's school and medical records and testimony. (R. 82-90.) He found that the claimant was not disabled, and that a cessation of disability benefits, effective January 2006, was appropriate. (R. 86.) In reaching his decision, DHO Finley explained:

The claimant has history of depression however, the claimant clearly

11

exaggerated her condition to the point that her testimony is not believable. The claimant has irregular treatment with her physician and was hospitalized the month that she received her cessation notice. This seems to be convenient hospitalization. The claimant acted in a very child-like manner, claimed to receive Special Education Services when in fact testing from school indicates claimant functions in the low-average range of intellectual ability. Therefore the severity of the claimant's condition is not determinable due to claimant faking her condition in a very poor manner [sic].

(R. 87.)

Between February 7, 2007 and October 3, 2007, claimant met with Dr. Chen on ten occasions. (R. 385-87.) On February 14, 2007, Dr. Chen completed a "Psychiatric Report" for submission to the Bureau. (R. 372-75.) In this report, he noted that he had met with claimant that day and the frequency of her visits was "irregular." (R. 372.) Dr. Chen reported that the claimant was "sad and worried," "soft spoken but coherent and relevant in general," had "fair" orientation, and had "auditory and visual hallucinations and some paranoia." (R. 373.) In that report, Dr. Chen diagnosed claimant with "Major Depressive Disorder Recurrent Type with psychotic features." (R. 375.)

On February 23, 2008, Dr. Chen completed a "Mental Impairment Questionnaire" regarding claimant. (R. 377-81.) The record indicates claimant and Dr. Chen had met on roughly a monthly basis from February through October 2007. (R. 385-87.) At the time Dr. Chen prepared his February 2008 questionnaire, the record indicates he had not met with claimant since October 3, 2007. (R. 387.) Regarding the "frequency and length of [his] contact" with claimant, Dr. Chen wrote: "monthly except for a few times since Nov 2006 [sic]." (R. 377.) In this report, Dr. Chen diagnosed claimant with schizoaffective disorder and a history of ADHD. (R. 377.) He found marked limitations in her activities of daily living, marked difficulties in social functioning, frequent

deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and repeated episodes of deterioration or decompensation in work or work-like settings.  (R. 380-81.)  Dr. Chen also found that claimant would have difficulty working at a regular job on a sustained basis due to "poor concentration, inner stimulation and low frustration tolerance."  (R. 380.)  He opined that these impairments would cause her to be absent from work more than three times a month.  (*Id.*)[5]

## C.    Testimony

### 1.    Testimony of Claimant

At the time of the June 23, 2008 hearing before the ALJ, Jimenez was 20 years old and living with her three children, the children's father, and his mother.  (R. 576-77.) Claimant testified that she attended school until the eighth or ninth grade and took some special education classes.  (R. 578-79.)  While in school, claimant was on medication for ADHD.  (R. 585.)  She also stated that she worked at Burger King for two weeks but quit because her coworkers laughed and talked about her.  (R. 579.)

Claimant testified that she had auditory and visual hallucinations five or six times a day since she was 15, but during the week before her February 2006 inpatient treatment at St. Mary's, she testified that she heard voices every day, every minute.  (R. 583-84.)  Claimant testified that she admitted herself to St. Mary's when she was 18 and stated she was experiencing auditory and visual hallucinations at that time.  (R. 585,

---

[5]  Claimant submitted additional medical records to the Appeals Council reflecting a one-day hospitalization at St. Mary's in July 2007.  (R. 461-568.)  Defendant argues that claimant has not submitted those records as new evidence on appeal to this Court, nor could she, as those records predate her hearing before the ALJ by nearly one year. (Resp. at n.1 [23].)  Claimant does not challenge those assertions in her reply [*see* 24].  As a result, we do not consider those records in resolving plaintiff's motion for summary judgment.

581.) Additionally, she testified that she met with Dr. Pedemonte once a week over an unspecified time period. (R. 584-85.) Before going to St. Mary's, claimant testified to taking medication. (R. 581-82.) She stated that she told Dr. Pedemonte about her hallucinations but that he did not change her medication. (R. 584-85.) Claimant did not specify how often she took medication prior to her treatment at St. Mary's. (R. 581-82.) Although she did not know the name of that medication, she stated that she wanted to admit herself into St. Mary's because the "depression pill" was no longer working. (*Id.*)

After St. Mary's, she stated that she followed up with Dr. Chen, and he changed her medication. (R. 581-82, 599.) Claimant indicated that Dr. Chen managed claimant's medication and recommended group counseling. (R. 594.) Claimant stated that she did not attend this counseling. (*Id.*) She explained that although she told Dr. Chen that she has not gone to group therapy because she did not like being around a lot of people, he did not make any recommendation to attend individual therapy. (R. 594-95.) Claimant testified that Dr. Chen prescribed her four medications: one for depression, one for anxiety, and two to help her sleep. (R. 599-600.) She testified that sometimes she has trouble sleeping because "the voices" disturb her. (R. 591.)

Jimenez testified that her typical day consists of playing with her children, watching television, and trying to clean. (R. 586.) She stated that her children's father is home during the day. (*Id.*) Claimant indicated they both care for their children. (*Id.*) Jimenez also stated that the children's paternal grandmother is not physically able to help out too much because she is diabetic and obese. (R. 586-87.) Claimant testified that her mother comes to see claimant every day and helps clean, cook on the stove, and do the laundry. (R. 595-96.) Jimenez testified that she has asthma and uses an

asthma pump but has no other physical ailments. (R. 588-89.) She also testified that she does not smoke marijuana but did in the past when she was 14. (R. 592.) As for the positive marijuana result in a February 2006 drug test, when claimant was 18 years old, claimant attributed that result to her being, shortly before taking the test, in an enclosed area with three of her cousins who were smoking marijuana. (R. 592-93.)

### 2. Testimony of Claimant's Mother

Carmen Jimenez, claimant's mother ("Carmen"), also testified at the June 23, 2008 hearing before the ALJ. At the time of the hearing, Carmen did not live with claimant. (R. 601.) Carmen testified that she went to Jimenez's home every day to help her. (R. 601-02.) Carmen stated that she traveled two hours each way on public transportation and she stayed at her daughter's home for three or four hours daily. (R. 605, 602.) Carmen stated that she had been doing this every day since claimant was 17 or 18 years old. (R. 605.) Carmen testified she makes sure Jimenez eats, encourages and helps her to clean the house, and does the laundry. (R. 602, 604.)

According to Carmen, when Jimenez was a young child, she was unable to stay still and had problems at school. (R. 605-06.) Carmen stated that her daughter began taking medication for her ADHD "when she was little," but that Carmen stopped giving claimant that particular medication when she was 12 or 13 because another psychiatrist told her continued use would result in brain damage. (R. 606-07.) Carmen did not provide the name of that other psychiatrist. Carmen denied that Jimenez was in a gang. (R. 607.) Carmen stated that in 2006, when claimant was 18, her cousins blew marijuana smoke into her face. (R. 608.) Carmen testified that Jimenez checked herself into St. Mary's two or three hours after this incident. (R. 608, 609.)

Carmen testified claimant stopped attending school in the eighth grade and lived with her until she was 17 years old. (R. 613, 614.) During the time between when claimant stopped going to school and turned 17, Carmen stated claimant could not stay still, was paranoid, and did not want to go anywhere. (R. 613, 614.) Although Carmen did not remember when claimant worked at Burger King, she testified claimant stopped working there because she was afraid people would attack or laugh at her. (R. 618-19.)

Carmen also testified that, from the time that claimant was 12 or 13 until she admitted herself to St. Mary's at age 18, claimant was taking medication prescribed by Dr. Pedemonte "just to relax her." (R. 610.) Carmen was unable to remember the name of that medication. (*Id.*) Carmen stated that claimant stopped seeing Dr. Pedemonte at the age of 13. (R. 616.) While claimant was still living with her mother, and was between the ages of 13 and 17 years old, Carmen testified that she did not take claimant to see any psychiatrist because it was difficult get the claimant to leave her home. (*Id.*) Carmen testified claimant was afraid to leave her house and was not taking her medication. (*Id.*) Carmen added that it was harder to get claimant to leave the house around the time of the trial and that claimant left her home about three or four times a month. (R. 617-18.) She also testified that claimant had been nervous about leaving the house since she was "very small," and would not stay at school unless Carmen stayed there with her. (R. 619.)

### 3.    Testimony of Medical Expert Ellen Rozenfeld

Ellen Rozenfeld, Psy.D., a medical expert ("ME"), also testified at the hearing. (R. 620-25.) She concluded that claimant currently has a diagnosis of schizoaffective disorder, as well as a history of ADHD and learning disabilities, and noted a reference to

a conduct disorder. (R. 620.) ME Rozenfeld noted that claimant's case was opened in 1995 and that she saw records through approximately 1998, as well as a psychiatric evaluation claimant's school did in 2001, after which it appeared claimant stopped going to school. (R. 620-21.) With respect to claimant's school records, ME Rozenfeld testified that claimant was in a "self-contained BDLD class," and that school testing suggested a "significant discrepancy" between her nonverbal and verbal intelligence, in that, at the time claimant was 14 years old, her reading and spelling abilities were at a second grade level and her math skills were at a fourth to fifth grade level. (R. 621.) ME Rozenfeld testified the school records also reflected claimant's behavioral problems, such as verbally abusing teachers and peers, leaving school at will, refusing to do work, and running away from home. (R. 621-22.) ME Rozenfeld opined that those problems were a possible expression of her depression, stating that "with kids a lot of times the expression is more of an external kind of thing in terms of agitation and physical acting out," and "as she becomes older it becomes more internalized in terms of a decrease in the more physical aggression." (R. 622.)

ME Rozenfeld also noted claimant's reports of past auditory and possible tactile hallucinations. (R. 622.) She testified that claimant's current testimony of having a history of hallucinatory experiences was consistent with her April 2001 reports to Dr. Fernald. (*Id.*) ME Rozenfeld also stated she could not read Dr. Chen's notes, but noted their time span and pointed out that while those notes reference claimant's hospitalizations in September 2006 and January 2008, those records had not been provided, although she did have records from claimant's February 2006 hospitalization. (*Id.*) ME Rozenfeld opined that claimant's GAF scores of 45 in April 2001, 30 in

17

February 2006, and 40 in February 2008 "are low and consistent." (R. 623.)

ME Rozenfeld acknowledged that there was a large gap in claimant's treatment from the time she was 13 to 18, and "no file evidence during that time frame." (R. 623.) She noted that gap corresponded to the time frame claimant "was pregnant on and off." (R. 623.) ME Rozenfeld confirmed with Carmen that claimant was living with Carmen during claimant's pregnancies, and had gone off her medication before getting pregnant. (R. 620.) After the ALJ noted that "this is an age 18 redetermination, so we're talking about 2005," and that "[f]rom 2005 on we're kind of restricted to the two visits to Chen and then the [February 2006] hospitalization and maybe a hospitalization we don't have in light of the history you've talked about already," ME Rozenfeld discussed Dr. Abrams' January 2006 consultative psychiatric examination. (R. 624.) She noted that during that examination, claimant reported her sister did the shopping, that claimant stated she is afraid she will be hurt if she goes out alone, and that "[s]he's been hearing voices since age 11 telling her to kill herself but no attempts [sic]." (*Id.*) She also noted an inconsistency between claimant's reports to Dr. Abrams that she was not taking medication and Dr. Chen's notes that he was prescribing claimant medication, at least as of 2005. (*Id.*)

Based on claimant's description of her activities of daily living and her dependence on her mother, ME Rozenfeld opined that claimant's impairments would result in marked restrictions in activities of daily living. (R. 624-25.) She noted that claimant "seems to lack confidence in her ability to perform any task independent [sic]" and noted she needed to go to the bathroom during the hearing but "would not go" and had a "look of fear as if she had to find it on her own or ask the guard for some

assistance." (*Id.*) Additionally, based on the hearing testimony that claimant "is not leaving alone [sic]" and "needs the comfort of someone with her," as well as Dr. Abrams' January 2006 consultative psychiatric examination, ME Rozenfeld also concluded that claimant had marked difficulties in social functioning. (R. 625.) Finally, after acknowledging that "there's less file evidence to address" regarding concentration, persistence and pace, ME Rozenfeld concluded claimant had "at least [] moderate" deficiencies in that area "just given the disruption of the anxiety, the possible continued auditory hallucinations, [and] the disruption of some of the paranoid concerns she has that that disrupts extended concentration [sic]." (*Id.*)

### 4. Testimony of Vocational Expert Lee Knutson

Lee Knutson, a vocational expert ("VE"), also testified at the June 23, 2008 hearing. (R. 625-29.) VE Knutson stated that the claimant did not have relevant past work experience. (R. 625.) In the Chicago metropolitan area, VE Knutson testified that there is a workforce of about 4 million people. (R. 626.)

The ALJ posed five hypothetical scenarios to VE Knutson. First, the ALJ asked VE Knutson to assume the following hypothetical person: an individual who (1) is 18 years of age; (2) is only able to read individual small words; (3) is unable to write; (4) does not have any physical, exertional limitations but should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; (5) has a mild limitation in maintaining concentration, persistence, and pace (able to function at 95 percent); (6) has a mild limitation in activities of daily living; (7) has a mild limitation with respect to social interactions; and (8) has a zero to one decompensation such that the individual would miss four days of work out of a work year. (R. 626.) The ALJ asked the VE

whether there are a number of jobs in the regional or national economy that such an individual could perform.  (*Id.*)  VE Knutson responded in the affirmative, and stated that such a hypothetical person would have approximately 5,000 retail bagger positions, approximately 45,000 unskilled janitor and cleaner positions, and approximately 27,200 unskilled medium level assembler positions.  (R. 627.)

Second, the ALJ asked VE Knutson if a hypothetical person, with the same conditions as the first, but instead the person had a marked limitation in maintaining concentration, persistence, and pace (able to function at 75 percent), would be able to maintain full-time competitive employment.  (R. 627-28.)  VE Knutson responded in the negative.  (R. 628.)  He opined that the individual would need the ability to function at 85 to 90 percent for even an unskilled, simple job.  (*Id.*)

Third, the ALJ asked VE Knutson if a hypothetical person, with the same conditions as the first but instead the person is unable to work with others, would have a number of jobs in the regional or national economy she could perform.  (R. 628.)  VE Knutson testified that of the 45,000 janitor and cleaner positions available to the first hypothetical person, about 15,000 of those jobs could be performed by working alone, such as a night-shift position.  (*Id.*)

Fourth, the ALJ asked VE Knutson if a hypothetical person, with the same conditions as the third hypothetical person but did not need supervision, would have a number of jobs in the regional or national economy that she could perform.  (R. 629.)  VE Knutson responded that no jobs met that description.  (*Id.*)

Finally, the ALJ asked VE Knutson if a hypothetical person, with the same conditions as the first, but instead having a marked limitation in activities of daily living

and a marked limitation with respect to social interactions, would have a number of jobs in the regional or national economy that she could perform. (R. 629.) VE Knutson stated there would be no jobs available for that type of individual. (*Id.*)

## II. LEGAL STANDARD

### A. Standard Of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of proof. *Kepple v. Massanari*, 268 F.3d 513, 515-16 (7th Cir. 2001). It means evidence a reasonable person would "accept as adequate to support the decision." *Murphy v. Astrue*, 496. F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 515-16. However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) *(quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm that decision. *Clifford*, 227 F.3d at 869. While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to his conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further,

the ALJ "may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision," *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) *(quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). In other words, "the issue before this court is whether the ALJ's findings were supported by substantial evidence, not whether [claimant] is disabled." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

## B. Analysis Under The Social Security Act

According to the Social Security Act (the "Act"), individuals who are eligible for SSI benefits as children must have their disability redetermined in the month preceding the month in which they turn 18. 42 U.S.C. § 1382c(a)(3)(H)(iii). The definition of disability used for adults who file new applications for SSI benefits is applied to such individuals. (*Id.*)

Whether a claimant qualifies to receive SSI benefits depends on whether he or she is "disabled" under the Act. An individual is disabled under the Act if he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must generally perform the following five-step inquiry: "(1) whether the claimant is

currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1171. However, the first step is not used when redetermining disability at age 18. 20 C.F.R. § 416.987(b). The claimant has the burden of establishing disability up to step four. *Zurawski v. Halter,* 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ employed the five-step analysis in evaluating Jimenez's claim. The ALJ found that Jimenez attained age 18 on August 12, 2005 and was eligible for SSI benefits as a child for the month preceding the month in which she attained age 18.[6] (R. 24.) At step two, ALJ Logan found that claimant had the following "severe" impairments: depression, a history of ADHD, and a history of learning disability. (*Id.*) At step three, the ALJ determined that since January 1, 2006, claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ then found that claimant has the residual functional capacity to: work without physical limitations; work in an environment devoid of concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; work with a mild limitation in concentration,

---

[6] According to other documents in the record, claimant's birth date is August 13, not August 12. (*See, e.g.*, R. 110, 144, 298.) However, the ALJ's (apparently typographical) error in stating that claimant's birth date is August 12 has no discernable impact on this matter.

persistence, and pace and activities of daily living; work with no limitations in social interaction and no episodes of decompensation, but that claimant would likely miss four days of work out of a year. (R. 25-27.) At step four, the ALJ determined: claimant had no past relevant work; claimant was a younger individual between the ages of 18 and 44; claimant had a limited education and was able to communicate in English; and the transferability of job skills was not an issue because claimant did not have past relevant work. (R. 31.) At step five, the ALJ found that since January 1, 2006, considering claimant's age, education, work experience, and residual functional capacity, claimant was able to perform a significant number of jobs in the national economy. (*Id.*) Thus, the ALJ concluded that the claimant's disability ended on January 1, 2006 and that the claimant had not become disabled again since that date. (R. 32.)

## III. ANALYSIS

Jimenez's motion takes issue with the ALJ's credibility determination and how that affected his analysis of the record evidence. (Mem. at 5.) First, she argues that the ALJ erred by failing to base his credibility determination on the medical or other credible evidence. (*Id.* at 5-12.) Second, Jimenez argues that the ALJ erred in rejecting the opinion of her treating physician, Dr. Chen, because his opinion was not inconsistent with the evidence. (*Id.* at 12-13.) Finally, Jimenez contends that the ALJ, in rejecting Dr. Chen's opinion, failed to follow the factors set forth in 20 C.F.R. § 416.927(d) to be used in weighing medical evidence. (*Id.* at 13-15.)

We conclude that the ALJ's opinion is deficient in multiple ways. As set forth in more detail below, the ALJ failed to consider the entire case record, including contrary evidence, when determining that claimant was "devoid of credibility." (R. 26.) The ALJ

24

also failed to adequately articulate his assessment of Carmen's credibility.  Finally, the ALJ's RFC assessment was deficient because he failed to properly weigh the medical evidence and failed to discuss evidence favorable to claimant.

## A. The ALJ Failed To Consider The Entire Case Record In Finding Claimant Lacked Credibility.

Because the ALJ is in a superior position to judge the credibility of a claimant, the ALJ's credibility finding will only be reversed if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (*quoting Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990)).  The ALJ's credibility determination is entitled to "special deference." *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (*citing Powers*, 207 F.3d at 435).  However, "[t]he ALJ must evaluate the record fairly.  Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling.  Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted).

Additionally, when assessing the credibility of statements supporting a Social Security application, the ALJ must comply with the requirements of Social Security Ruling ("SSR") 96-7p.  *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).  Among other things, SSR 96-7p requires ALJs to consider the entire case record when evaluating an individual's credibility, and to specifically articulate the reasons behind credibility evaluations.  1996 WL 374186, at *4 (S.S.A. July 2, 1996).  Relatedly, SSR 96-7p outlines how an ALJ should go about assessing a claimant's credibility when her allegedly disabling symptoms, such as pain or fatigue, are not objectively verifiable.  *Id.*

at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If the objective medical evidence does not support her symptoms, SSR 96-7p instructs the ALJ to consider the entire case record.  In such cases, where the claimant offers medical evidence that she suffers from a condition that might give rise to disabling symptoms, but the nature of her symptoms are subjective, the ALJ's finding of severity depends on the claimant's credibility, evaluated in light of all the evidence in the case record.  *Id.*  That includes "statements or reports from [the claimant], [her] treating or nontreating source, and others about [her] medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how [her] impairment(s) and any related symptoms affect [her] ability to work."  20 C.F.R. § 404.1529(a).

Here, the ALJ found that claimant "suffers from depression, but most certainly not to the extent that she alleges" (R. 27), and concluded that she was "devoid of credibility" because her "representations and actions were precipitated in the hopes of remaining on disability."  (R. 26.)  As discussed more fully below, we conclude that reversal is warranted because the ALJ's failed to consider the entire case record in making his credibility determination.

### 1.     The ALJ Failed to Discuss Evidence that Contradicted His Credibility Determination.

The ALJ's opinion improperly ignored four key lines of evidence supportive of claimant's credibility in making his credibility determination.  First, Dr. Chen, claimant's treating physician, and Dr. Abrams, a consultant for the Illinois Bureau, specifically ruled out malingering in their assessments of Jimenez.  (R. 378, 305.)  However, the ALJ's opinion does not discuss those portions of those physicians' opinions, much less

26

articulate why the ALJ rejected them in particular.  Second, Dr. Abrams diagnosed claimant with schizoaffective disorder with depressive features and reported that she was in "partial remission."  (R. 305.)  Again, the ALJ did not discuss this aspect of Dr. Abrams' opinion or describe why he was not swayed by this contrary evidence.  Third, ME Rozenfeld, who testified as an impartial medical expert and reviewed the same evidence and listened to the same testimony as the ALJ, apparently did not conclude that claimant was malingering or lacked credibility.  (R. 620-25.)  Again, the ALJ's opinion does not specifically address that fact.

Finally, the ALJ did not discuss evidence from Claimant's 2005 Activities of Daily Living Questionnaire that she heard voices.  (R. 124.)  That evidence in turn contradicts the ALJ's finding that, other than Dr. Fernald's 2001 report, there is "no history of the claimant prior to the beginning of 2006 having psychosis."  (R. 29.)  However, the ALJ does not appear to have considered that questionnaire in the context of evaluating, among other things, claimant's alleged psychosis.  As the legal authorities described above dictate, the ALJ must consider the entire case record when evaluating a claimant's credibility, particularly where the nature of her symptoms are subjective, and may not ignore any line of evidence that is contrary to his ruling.  *See, e.g.,* SSR 96-7p, 1996 WL 374186, at **4, 2; 20 C.F.R. § 404.1529(a); *Golembiewski*, 322 F.3d at 917. Further, "[w]hen the ALJ does reject medical evidence, he must 'minimally articulate his reasons for crediting or rejecting' that evidence."  *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992).  Because the ALJ failed to consider this evidence contrary to his credibility determination, and failed to articulate his reasons for rejecting it, remand is required.  On remand, the ALJ should specifically discuss the evidence described

above, as well as any other contrary evidence, in the context of his credibility determination.

### 2. The ALJ Failed to Discuss the Proffered Reason for Claimant's Failure to Seek Treatment for Several Years.

With respect to a claimant's "medical treatment history," SSR 96-7p provides that "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." 1996 WL 374186, at *7. However, SSR 96-7p instructs that the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.*

Here, Jimenez argues that she did not receive medical treatment between April 2001 and September 2005 because she did not like to leave her home. (Mem. at 8.) According to the hearing transcript, claimant never explicitly stated as much to the ALJ. During the hearing, the ALJ inquired about the gap in treatment. He asked Jimenez if she had received any treatment "for hallucinations, for voices, for depression" before checking herself in to St. Mary's in February 2006. (R. 580-81.) Claimant first indicated that she did not understand the question, and then stated that she did not remember whether she had seen any doctor for such treatment before going to St. Mary's. (R. 581-82.) Claimant said nothing to the ALJ regarding her reluctance to leave her home.

However, later during the hearing, claimant told the ALJ she did not attend the group counseling recommended by Dr. Chen because she did not like being around a

lot of people. (R. 594-95.) Additionally, the ALJ asked Carmen about claimant's behavior between April 2001 and September 2005. (R. 609-16.) After noting that claimant was no longer in school at that time, the ALJ asked Carmen why she did not take claimant to receive treatment during that period, despite her "significant problems." (R. 615-16.) Carmen testified that claimant was "afraid to get out of the house and she didn't have no medication. So it was hard for me to get her out of the house." (R. 616.) Finally, Dr. Abrams' January 2006 report reflects claimant's statement that she was afraid of going out alone and so she does not take public transportation. (R. 304.)

Unfortunately, the ALJ's opinion does not discuss any of this evidence explaining why claimant did not get treatment for over four years. As a result, we cannot determine whether the ALJ complied with SSR 96-7p's requirement to "consider[] any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Further, because this evidence contradicts the ALJ's conclusion that claimant sought treatment again beginning in 2005 only because her benefits were in jeopardy of being terminated, the ALJ erred by failing to confront it in his opinion and explain why he rejected it. *Golembiewski*, 322 F.3d at 917; *Myles*, 582 F.3d at 678; *Indoranto*, 374 F.3d at 474. As a result, remand is warranted.

**B.    The ALJ Failed To Build An Accurate And Logical Bridge From The Evidence To His Conclusion That Claimant's Mother Lacked Credibility.**

As noted above, SSR 96-7p requires that an ALJ evaluate the credibility of a claimant's description of symptoms in conjunction with, among other things, "statements and other information provided ... by other persons about the symptoms and how they

affect the individual." 1996 WL 374186, at *2. Additionally, the ALJ must "minimally articulate" his justification for a credibility assessment. *Herrmann v. Astrue*, No. 07-6914, 2010 WL 356233, at *14 (N.D. Ill. 2010) (*citing Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)).

Here, we conclude that the ALJ's assessment of Carmen's credibility should have involved more expansive treatment. The ALJ's opinion noted that Carmen "repeated the cousin-marijuana story" during her hearing testimony, and that Carmen testified that, since claimant was 17 or 18, Carmen has, each day, spent four hours in transit and another three to four hours at claimant's home to help take care of claimant. (R. 30.) The ALJ then wrote that Carmen's testimony regarding her efforts to care for claimant "seem inherently incredible. Indeed, the claimant told the social worker that she used to have a good relationship with her mother but not anymore she says 'Hi and bye to her'[sic]." (*Id.*) However, the ALJ's only articulated reason for finding that testimony incredible – claimant's February 2006 statement regarding the status of her relationship with her mother – is insufficient. The ALJ's failure to "minimally articulate" his justification for finding Carmen incredible prevents us from tracing the path of his reasoning and thus justifies remand.

Given our conclusions above, we need not assess whether claimant's challenges to other aspects of the ALJ's credibility determination independently warrant remand. However, we do note the following. We do agree with claimant that the ALJ appears to have erroneously noted that during claimant's January 2006 examination with Dr. Abrams, "claimant reported that she takes care of 3 children." (R. 26.) This Court was unable to locate such a statement in our review of Dr. Abrams' report. (*See* R. 304-05.)

Additionally, according to SSR 96-7p, "symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not allege the same intensity, persistence, or functional effects of his or her symptoms." 1996 WL 374186, at *5. As a result, on remand, the ALJ should consider whether the passage of time and its possible impact on claimant's condition may explain any contradictions or inconsistencies between her behavior before Dr. Abrams and DHO Finley, or the evidence of her caring for her children or doing housework.

### C. The ALJ's RFC Determination was Deficient.

The ALJ is required to determine a claimant's RFC by evaluating whether the "objective medical evidence and other evidence" is consistent with her subjective statements regarding her impairment. *See* 20 C.F.R. § 404.1529(a), (d)(3)-(4); *Berger*, 516 F.3d at 544. Relatedly, the Commissioner must "evaluate every medical opinion [it] receive[s]." 20 C.F.R. § 416.927(d). Each medical opinion, other than a treating physician's opinion that is entitled to controlling weight, must be evaluated pursuant to the following factors in order to determine the proper weight to apply to it: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 416.927(d); *see generally White v. Barnhart*, 415 F.3d 654, 658-60 (7th Cir. 2005). Notably, "[a]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."

31

*Clifford*, 227 F.3d at 870; *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.") (collecting cases).

Here, the ALJ concluded, among other things, that Jimenez required a work environment that would accommodate "a mild limitation in concentration, persistence and pace and activities of daily living," and that while she could work "with no limitations in social interaction and no episodes in decompensation" she "would likely miss four days of work out of the year."  (R. 25.)  As set forth below, we conclude that the ALJ's RFC determination is deficient because the ALJ failed to properly weigh the medical evidence and failed to discuss evidence favorable to Jimenez.

### 1.    The ALJ Failed to Properly Weigh the Medical Evidence.

Both Dr. Chen and ME Rozenfeld found Jimenez had marked difficulties in maintaining social functioning and marked restrictions in activities of daily living.  (R. 380; R. 624-25.)  Dr. Chen also found she had "frequent" deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner, as well as "repeated" episodes of deterioration or decompensation in work or work-like settings. (R. 380-81.)  ME Rozenfeld concluded she had "at least [] moderate" deficiencies in concentration, persistence and pace.  (R. 625.)  Finally, Dr. Chen found Jimenez would have difficulty working a regular job on a sustained basis due to "poor concentration, inner stimulation and low frustration tolerance," and opined her impairments would cause her to be absent from work more than three times a month.  (R. 380.)

As the ALJ recognized, his RFC analysis was driven largely by his conclusion that "claimant is devoid of credibility" and that "her representations and actions were

precipitated in hopes of remaining on disability." (R. 26.) As a result, his rejection of Dr. Chen's and ME Rozenfeld's opinions was based almost entirely on his finding that Jimenez lacked credibility and that her actions were "contrivances" to try to establish her disability. (R. 31.) Thus, the ALJ gave "much less than controlling weight" to the RFC assessment of claimant's treating physician Dr. Chen because Dr. Chen's "conclusions are based on the claimant's false presentation and representations." (R. 31.) Further, the ALJ gave "no weight to the testimony" of ME Rozenfeld "because she relied on the claimant's February 2006 hospitalization and the fact that the claimant did see Dr. Chen." (*Id.*)

In light of our conclusion that the ALJ failed to consider all the relevant evidence in making his credibility determination, we also find that on remand, the ALJ must reassess the "objective medical evidence and other evidence," including the contrary opinions of Dr. Chen and ME Rozenfeld, in the context of his RFC determination. *See* 20 C.F.R. § 404.1529(a), (d)(3)-(4); *Berger*, 516 F.3d at 544. On remand, should the ALJ decline to give Dr. Chen's opinion controlling weight, the ALJ must consider and discuss the factors set forth in 20 C.F.R. § 416.927(d) when evaluating Dr. Chen's opinion, and give "good reasons" for whatever weight he affords that opinion.

Additionally, we find that the ALJ erred in failing to address Dr. Abrams' opinion in accordance with 20 C.F.R. § 416.927(d). It is unclear what weight the ALJ gave Dr. Abrams' opinion. On the one hand, the ALJ discussed portions of Dr. Abrams' opinion that supported the ALJ's conclusions. For example, the ALJ noted "Dr. Abrams assessed that the claimant's memory and concentration were fair." (R. 26.) However, the ALJ ignored significant portions of Dr. Abrams' opinion that were favorable to

33

claimant, including Dr. Abrams' conclusions that Jimenez was not malingering, that her schizoaffective disorder was in partial remission, and that if she were declared disabled, she would not be able to handle her own funds due to her poor ability to calculate. (R. 304, 305.) On remand, the ALJ must discuss the weight he affords Dr. Abrams' opinion, as well as any evidence that contradicts the ALJ's conclusions.

We also find that the ALJ failed to "evaluate every medical opinion [he] receive[d]." 20 C.F.R. § 416.927(d). Contrary to that regulation, the ALJ made no mention of the opinions of Dr. Boyenga or Dr. Hudspeth, two consultative physicians who submitted reports regarding claimant. Both those doctors' opinions contain statements that support, and undercut, the ALJ's credibility and RFC determinations. For example, while Dr. Boyenga noted that claimant's credibility is "suspect" (R. 325), he also concluded Jimenez had moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, moderate restrictions in activities of daily living, and no episodes of decompensation. (R. 337.) Additionally, while Dr. Hudspeth indicated that certain of claimant's complaints were "not supported by the medical evidence in file [sic]" (R. 322), and that she "is capable of performing substantial gainful work activity" (R. 308), he also found that claimant had moderate limitations in her ability to understand, remember and carry out detailed instructions, and moderate limitations in maintaining concentration, persistence and pace for an extended period of time. (R. 308, 322.)

Finally, the ALJ erred by failing to weigh and resolve the conflicts between the medical evidence discussed above. "In assessing conflicting medical opinion evidence, ALJs must consider a variety of factors, including whether a physician is a treating or

examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (*citing* 20 C.F.R. §§ 404.1527(a)-(d), 416.927(a)-(d)); *see also Diaz*, 55 F.3d at 306 n.2 ("[I]f conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.").  Rather than addressing and resolving the conflicting medical evidence regarding, among other things, whether claimant was a malingerer, the ALJ essentially accepted DHO Finley's opinion that claimant was faking her condition.  In light of the conflicting medical evidence on that and other issues, remand is warranted.

### 2.    The ALJ Failed to Discuss Evidence Favorable to Claimant.

As noted above, an ALJ cannot ignore evidence favorable to a claimant.  *Myles*, 582 F.3d at 678.  Instead, the ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected."  *Indoranto*, 374 F.3d at 474.

Here, the ALJ found that Jimenez could work with no limitations in social interaction, and that she had at worst mild limitations in concentration, persistence and pace and activities of daily living.  (R. 25-27.)  However, the ALJ failed to discuss medical evidence from Dr. Abrams concerning her shyness, insecurity, anxiousness, "borderline intellectual functioning," and a "poor ability to calculate" that would prohibit her from handling her own funds.  (R. 304, 305.)  Further, because he made no mention of either Dr. Boyenga or Dr. Hudspeth, the ALJ also failed to confront their contrary conclusions regarding claimant's limitations.  (*See* R. 337, 308, 322.)

Further, as noted above, the ALJ also made a factual error in finding that Jimenez reported to Dr. Abrams that she takes care of her three children.  (R. 26.)  Dr.

Abrams' report does not appear to include such a statement.  (*See* R. 304-05.)

Because the ALJ relied on that phantom statement to support his finding that Jimenez

has at worst a mild limitation in concentration, persistence and pace and activities of

daily living, his RFC assessment is flawed.  As also discussed above, the ALJ failed to

discuss the conflicting medical evidence regarding whether claimant is a malingerer.

Given the primacy of the ALJ's credibility determination to his RFC assessment, that

failure also warrants remand.

Finally, we note that, for all of the same reasons that the ALJ's RFC

determination fell short, the ALJ's hypothetical questions to VE Knutson, which were

based almost entirely on that RFC assessment, did as well.  "When the hypothetical

question is fundamentally flawed because it is limited to the facts presented in the

question and does not include all of the limitations supported by medical evidence in the

record, the decision of the ALJ that a claimant can adjust to other work in the economy

cannot stand."  *Young v. Barnhart*, 362 F.3d 995, 1005 (7th Cir. 2004).  For this reason,

as well as the others discussed above, remand is required.

## IV.    CONCLUSION

For the reasons set forth above, Jimenez's motion for summary judgment [15] is

granted.  This case is remanded to the Social Security Administration for further

proceedings consistent with this opinion.  It is so ordered.

ENTERED:

_____
MICHAEL T. MASON
United States Magistrate Judge

Dated: July 5, 2011